**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PAMELA M. CASSIDY**, | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **2:13-1203** |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION

May 16, 2014

## I.      Introduction

Pamela M. Cassidy ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383(f). This case comes before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 6, 9). The record was thoroughly developed at the administrative level of the proceeding. (ECF No. 4). Each side filed a brief in support of its motion (ECF Nos. 7, 9), and Plaintiff also filed a reply brief in response to the Commissioner's motion (ECF No. 10). Accordingly, the matter is ripe for disposition, and for the following reasons, the Commissioner's motion will be **DENIED**, and Plaintiff's motion will be **GRANTED**.

## II.      Background

### A.      Factual Background

Plaintiff was born on April 15, 1962. (R. 154). She is a high school graduate with past

1

relevant work experience as a bartender, deli worker, bagger, food sales clerk, packer/inspector, and sewing machine operator. (R. 87-88).

Plaintiff alleges disability as of February 28, 2006, due to a torn rotator cuff in each shoulder, anxiety, arthritis, and tendonitis. (R. 158). The record reflects that Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date.

### 1.     History of Medical Treatment

In January 2004, Plaintiff injured her right shoulder while working at her last job. (R. 332, 341, 426). As a result, she underwent physical therapy and received chiropractic treatment. (R. 426). A year later, she was diagnosed with a torn right rotator cuff and declared a candidate for arthroscopic surgery. (R. 426). The surgery was performed by Ari Pressman, M.D., in May 2005. (R. 409). During the procedure, Dr. Pressman observed that Plaintiff's rotator cuff was not actually torn, as suspected. (R. 409). Other repairs to Plaintiff's shoulder were made, however. (R. 409). In the months immediately following her surgery, Plaintiff was progressing well, though she experienced some stiffness and pain. (R. 420-23). She was undergoing physical therapy and taking pain medications and eventually returned to work in August 2005. (R. 330, 418).

In November 2005, six months after the surgery, Dr. Pressman declared that Plaintiff was doing "quite well," though she was "not yet back to full function." (R. 417). Dr. Pressman suspected that the continued pain could be the result of a tear in the rotator cuff that went unobserved during the surgery, so he ordered an MRI. (R. 417). The MRI revealed post-operative changes and a complete tear of the supraspinatus tendon. (R. 416). The next month, Plaintiff followed-up with Thomas F. Brockmeyer, M.D., with continued symptoms in her right shoulder. (R. 414). Dr. Brockmeyer reviewed the results of Plaintiff's recent MRI and

acknowledged that it showed clear evidence of a rotator cuff tear with retraction. (R. 414). Nevertheless, he continued Plaintiff on light-duty work with no overhead lifting. (R. 414). He also noted that she should follow-up with Dr. Pressman again in three-to-four weeks and that she would likely need repeat surgery on her right shoulder early in 2006. (R. 414).

In January 2006, Dr. Pressman referred Plaintiff to Thomas Hughes, M.D., of the Human Motion/All Hand Center. (R. 330). During her first visit with Dr. Hughes, Plaintiff reported that she did not feel as though she had improved after her May 2005 surgery. (R. 330). She continued to have pain, which had progressed to the point that she could no longer do her hair with her right hand, put dishes away in overhead cabinets, sleep on her right side, and do other daily activities such as getting dressed and brushing her teeth. (R. 330). Upon examination, Plaintiff did not display any acute distress. (R. 330). Her elbow had a full range of motion. (R. 330). She had pain with active range of motion of the shoulder, with active forward flexion of only about 90 degrees, and active abduction to 70 degrees. (R. 330). She displayed excellent passive range of motion of 100 degrees of forward flexion and 100 degrees of abduction. (R. 330). Plaintiff had significant pain and weakness when her supraspinatus tendon was isolated. (R. 331). She also had pain over her biceps and with crossover adduction. (R. 331). At the conclusion of the examination, Dr. Hughes' recommended that Plaintiff undergo surgery to repair the torn rotator cuff. (R. 331, 333). In the meantime, Plaintiff was permitted to continue with light-duty work. (R. 331).

On February 3, 2006, Dr. Hughes performed a right shoulder arthroscopy on Plaintiff, during which he identified a full-thickness rotator cuff tear of the supraspinatus tendon. (R. 333). He also observed some labral wear, which was debrided. (R. 333). Plaintiff followed-up with Dr. Hughes on February 16, 2006, at which time her sutures were removed and she was started on

physical therapy. (R. 333).

Plaintiff had another follow-up with Dr. Hughes on April 18, 2006. (R. 329). Plaintiff reported that two or three weeks before her appointment, she felt a pop in her shoulder, and since then she had less range of motion and felt more pain. (R. 329). After examining Plaintiff, Dr. Hughes noted that Plaintiff still had good active motion of the supraspinatus with forward elevation and abduction to at least 90 degrees. (R. 329). Although Plaintiff complained of considerable pain in her shoulder, Dr. Hughes noted that he was not "terribly concerned" about the pain. (R. 329). Nonetheless, Dr. Hughes decided to obtain an MRI-arthrogram. (R. 329). The test revealed an extremely attenuated supraspinatus tendon; however, there was no full-thickness tear or extravasation of fluid into the subacromial bursa, which suggested that Plaintiff's rotator cuff was still intact. (R. 334).

Dr. Hughes reviewed the results of the MRI with Plaintiff on May 23, 2006, at which time Plaintiff reported that she had not experienced any improvement in strength or activity level. (R. 334). She had, however, experienced a significant increase in pain. (R. 334). After reviewing the results of the MRI with Plaintiff, Dr. Hughes recommended that she undergo arthroscopic revision surgery to address the tear, which Dr. Hughes performed on June 26, 2006. (R. 334).

Plaintiff had a post-operative follow-up on July 11. (R. 328). By this time, her wounds were well healed, but she remained in pain. (R. 328). Dr. Hughes decided to keep her out of work, sent her back to physical therapy, and kept her on Vicodin. (R. 328).

Plaintiff returned for another follow-up on August 22. (R. 327). Dr. Hughes noted that Plaintiff continued to experience pain, which worsened during therapy. (R. 327). As a result, Dr. Hughes instructed Plaintiff to stop attending therapy for a month. (R. 327). While Dr. Hughes

noted that "this will put her at great risk for stiffness," he was more concerned about "trying to control [Plaintiff's] pain symptoms." (R. 327).

When Plaintiff was seen by Dr. Hughes on September 19, 2006, she reported that she continued to experience pain, despite the cessation of therapy. (R. 326). In view of that, Dr. Hughes decided to obtain another MRI-arthrogram to determine whether her rotator cuff had torn again. (R. 326). The MRI was performed on October 2, and the results revealed a large, full-thickness rotator cuff tear in a new location – the posterior edge of the supraspinatus, as opposed to the anterior edge where the previous tears had been. (R. 335). Based on the results of the MRI, Dr. Hughes decided to perform an open rotator cuff repair with a graft jacket supplementation to try to reinforce her tear and prevent future tearing. (R. 335). The surgery was performed on January 5, 2007. (R. 335).

Two months after the surgery, Plaintiff had a follow-up with Dr. Hughes. (R. 322). Plaintiff was undergoing physical therapy and was still in a lot of pain, for which she was taking Vicodin. (R. 322). Plaintiff reported that she did not think the Vicodin was very helpful. (R. 322). Dr. Hughes' plan was to continue Plaintiff on physical therapy. (R. 322). He also prescribed her with Vicodin Extra Strength ("ES") and prohibited her from returning to work. (R. 322). Dr. Hughes noted, however, that Plaintiff could possibly return to a modified-duty job in two months. (R. 322).

Plaintiff next presented to Dr. Hughes for treatment on March 20, 2007, for the first time complaining of pain in her left shoulder. (R. 320). Dr. Hughes ordered an MRI to determine whether the pain was the result of a torn rotator cuff. (R. 320).

At her next appointment with Dr. Hughes, on May 15, 2007, Plaintiff said that she felt like something may have popped in her right shoulder, which had been bothering her a bit more

lately. (R. 319). Plaintiff thought that she should undergo an MRI to evaluate her condition. (R. 319). Dr. Hughes disagreed. (R. 319). "I told her that with [her] track record even if she has a retear I would not really recommend further surgical intervention," Dr. Hughes noted. (R. 319). With respect to Plaintiff's left shoulder, Dr. Hughes noted that the recent MRI showed a small, full-thickness tear without retraction. (R. 319). Although Dr. Hughes felt that Plaintiff would probably benefit from surgery to mend the tear, he felt that she could not tolerate it well at the time because she was still recovering from the surgery on her right side. (R. 319). Plaintiff also reported that she had recently started to experience numbness and tingling in her right hand, and Dr. Hughes ordered an EMG to get to the root of the problem, the results of which were normal. (R. 319).

During Plaintiff July 3, 2007, appointment, Dr. Hughes noted that Plaintiff had probably suffered another re-tear in her right shoulder, which led him to believe that she would never return to normal function. (R. 317-18). He did not recommend further surgery, however, because he did not think he could do anything else to improve on what had previously been done. (R. 318). With regard to Plaintiff's left shoulder, Dr. Hughes reiterated his earlier diagnosis of a small tear, which had probably been caused by Plaintiff's increased reliance on her left side as a result of her prior right shoulder surgeries. (R. 318). At this point, Plaintiff did not want to do anything about the tear. (R. 318). Dr. Hughes continued her on Vicodin ES and referred her to a pain management clinic for long-term treatment. (R. 318). He noted that Plaintiff had been on narcotics for an extended period of time and may require them permanently to manage the pain in her right shoulder. (R. 318).

Plaintiff presented to Zongfu Chen, M.D., of UPMC Pain Medicine, for an initial examination on July 23, 2007. (R. 272). Plaintiff described experiencing pain, accompanied by a

limited range of motion, mostly in her right shoulder, but she also reported recently having felt increased pain on her left side. (R. 318). She said that the pain was constantly bothering her. (R. 272). She described it as "sharp, stabbing, shooting, throbbing, tingling, tender, cold, aching, and constant." (R. 272). When asked to rate the pain on a scale from one to ten, Plaintiff responded that it was nine-to-ten out of ten. (R. 272). Motion, weather changes, lifting, lying, and inactivity all made the pain worse. (R. 272). The pain was accompanied by weakness, numbness, and tenderness in the bilateral shoulders and sometimes radiated into her bilateral arms. (R. 272). Additionally, she described feeling some tingling in her hands. (R. 272). Plaintiff reported that she had been taking Vicodin ES four-to-five times daily but to no avail. (R. 272). Upon examination, Dr. Chen found that Plaintiff could use her right arm and her hand-grip strength was normal. (R. 273). However, while she had a normal range of motion in her left shoulder, she had a limited range of motion in her right shoulder as a result of the pain. (R. 273). She also displayed significant tenderness on the bilateral shoulders, most noticeably on the right side. (R. 273). Even with only a small touch of the shoulder, Plaintiff appeared to be in extreme pain. (R. 273). Dr. Chen also found, however, that whenever Plaintiff was distracted, the pain was reduced. (R. 273). In addition, a bilateral Patrick test was negative. (R. 273). After diagnosing Plaintiff with bilateral shoulder pain and bilateral shoulder osteoarthritis, Dr. Chen prescribed Plaintiff with Lodine, a Lidoderm patch, Flexeril, Vicodin, and a TENS unit. (R. 274).

When she was seen by Dr. Hughes on September 4, 2007, Plaintiff reported that the prescriptions she had received from Dr. Chu had provided some relief, but her physical therapy was not helping. (R. 316). Dr. Hughes told Plaintiff that she was a candidate for a left rotator cuff repair. (R. 316). He also "explained to her, however, that given the problems that she has had on the right shoulder, I do not know that I would ever anticipate that this would go on to be

normal." (R. 316).

Plaintiff had the surgery on her left shoulder on October 26, and a small, full-thickness tear of the left supraspinatus tendon was repaired. (R. 337). At her follow-up two weeks later, Plaintiff appeared to be doing well. (R. 315). She had a lot less pain on her left side than she had on her right side. (R. 315). Dr. Hughes nevertheless kept Plaintiff out of work, ordered her to undergo physical therapy on her left, and scheduled a follow-up for two months. (R. 315).

Dr. Hughes last saw Plaintiff on November 15, 2007, at which point her left shoulder was doing relatively well. (R. 337). She had 80 degrees of active forward elevation and was still progressing with her therapy, though she did continue to experience some pain. (R. 337). By contrast, Dr. Hughes noted that "[t]he right side remained relatively dysfunctional." (R. 337).

Dr. Hughes wrote the following narrative report dated February 4, 2008, in relation to a pending workers' compensation claim filed by Plaintiff:

> As far as future treatment recommendations, for the right side I do not feel that further surgical intervention or physical therapy would be of tremendous value. We would continue with chronic pain management as I do not think that there is much I can do to improve her. On the right side, I believe she has reached maximum medical improvement. I would not allow her to use that arm for work. Given the chronic pain she has, her easy fatigability, and significant limits of her right arm, I do not feel she can go back to her previous employment. I feel that a completely sedentary one-handed left-sided work may be something she can consider in the future, although obviously given her recent shoulder surgery I do not think that that is possible right now.

(R. 338).

Also in relation to her workers' compensation claim, Plaintiff underwent an independent medical examination with Steven E. Kann, M.D., on July 18, 2008. (R. 340). At the time of the examination, Plaintiff was not working or receiving any treatment for her shoulder injuries, aside from taking anti-inflammatories and a muscle relaxant. (R. 341). Plaintiff's chief complaint was pain and weakness in her right shoulder. (R. 341). She also had pain and weakness in her left

shoulder. (R. 341). Dr. Kann's examination of Plaintiff's right shoulder revealed well-healed arthroscopic portal sites and a well-healed incision. (R. 341). Plaintiff could actively forwardly flex to 90 degrees, passively forwardly flex to 130 degrees, externally rotate to 40 degrees, and internally rotate to L1. (R. 341). She had a positive Neer test, positive Hawkins test, 4/5 isolated supraspinatus, 4/5 external rotation, 5/5 subscapularis push-off, negative speed test, and negative Yergason test. (R. 342). There was no overt crepitus (i.e., grating, crackling, or popping sounds) with shoulder range of motion and no pain at the acromioclavicular ("AC") joint region or with cross-chest adduction. (R. 342). Examination of the left shoulder also revealed well-healed arthroscopic portal sites. (R. 342). Plaintiff had a positive Neer, positive Hawkins, 5-/5 isolated supraspinatus strength testing, 5/5 external rotation, and subscapularis push-off. (R. 342). Moreover, she could forwardly flex to 160 degrees, externally rotate to 45 degrees, and internally rotate to T10. (R. 342). Plaintiff did not experience any pain to the touch at the AC joint with cross-chest adduction. (R. 342).

Based on his examination, Dr. Kann opined that Plaintiff "achieved a state of maximum medical improvement" in her right shoulder, so she would always require activity modifications with respect to that shoulder in the future. (R. 342). Dr. Kann also opined that Plaintiff had possible persistent rotator cuff pathology of the left side. (R. 379).

Beginning in either 2009 or 2010, Plaintiff began treating with Dominic Dileo, M.D., at Uniontown Hospital. (R. 48). At the behest of Dr. Dileo, Plaintiff underwent x-rays on February 12, 2010, after complaining of right hip pain. (R. 408). The x-rays revealed osteoarthritis of the right hip and right SI joints, but no acute fractures. Plaintiff testified that her hip pain seemed to worsen after these x-rays were obtained, but she lacked "insurance to be able to afford the proper

testing to see if . . . if I need a new hip . . . ."[1] (R. 63).

## 2.  Consultative Examination

Plaintiff underwent a physiatric disability examination with Richard S. Kaplan, M.D., on October 1, 2010. (R. 379). During the exam, Plaintiff described constantly feeling diffuse pain throughout her arms, particularly in her shoulders. (R. 380). Dr. Kaplan found that Plaintiff had moderate impingement signs in both shoulders, with no overhead motion or abduction of either shoulder more than 90 degrees. (R. 380). Plaintiff otherwise displayed a normal range of motion in her upper extremities. (R. 380). Likewise, she displayed normal range of motion, strength, and sensation in her lower extremities, though she did report mild hip pain upon rotation. (R. 380). Dr. Kaplan found that she had a non-antalgic gait (i.e., she did not walk in a way that suggested she was avoiding pain). (R. 380). She was also able to get on and off the exam table without any difficulty. (R. 380).

Based upon his examination, Dr. Kaplan completed a medical source statement ("MSS"), in which he indicated that Plaintiff was unable to perform overhead activities with either arm and that Plaintiff would be able to lift/carry two-to-three pounds frequently and ten pounds occasionally. (R. 381). He found that Plaintiff had no limitations in sitting, walking, reaching, handling, and fingering. (R. 381). However, according to Dr. Kaplan, Plaintiff was limited in her ability to push/pull with her upper extremities; could only occasionally bend or kneel; and could never stoop, crouch, balance, or climb.[2] (R. 382). Dr. Kaplan also opined that Plaintiff should

---

[1] The radiology report dated February 12, 2010, is the only medical record evidencing Plaintiff's history of treatment with Dr. Dileo, whom she began seeing in either 2009 or 2010, and also the only record referring to Plaintiff's hip impairment. (R. 408). Plaintiff's counsel represented to the ALJ that he had requested all of the records from Plaintiff's treatment with Dr. Dileo, but Dr. Dileo's office failed to comply with his request. (R. 48-49).

[2] There is a slight inconsistency in Dr. Kaplan's MSS. In his letter to the state agency, which precedes the check-box RFC assessment form, Dr. Kaplan wrote that he "would recommend only occasional postural activities[,]" without distinguishing among the various types of postural activities. (R. 380). In his check-box form, however, he clarified

avoid heights. (R. 382).

### 3. Evidence from State Agency Consultative Physician

Ellen Wyszomierski, M.D., a state agency consultative physician, completed a physical RFC assessment form on October 22, 2010. (R. 401). Dr. Wyszomierski opined that Plaintiff could lift up to ten pounds frequently; stand/walk about six hours in a full workday; and sit about six hours in a full workday. (R. 401). She found that Plaintiff had a limited ability to push/pull in her upper extremities and could occasionally balance, stoop, kneel, crouch, and climb ramps and stairs. (R. 402). In Dr. Wyszomierski's view, however, Plaintiff could never crawl or climb ladders, ropes and scaffolds. (R. 402). Dr. Wyszomierski also opined that Plaintiff was limited in her ability to reach in all directions (including overhead) and to handle (gross manipulation), but unlimited in her ability to finger (fine manipulation) and feel (skin receptors). (R. 402).

### 4. Evidence from State Agency Consultative Psychologist

On October 19, 2010, Manella Link, Ph.D., a state agency psychologist, reviewed Plaintiff's file and completed a mental RFC assessment form. (R. 396). Dr. Link noted that Plaintiff has no history of treatment for mental health issues. (R. 399). Dr. Link also acknowledged, however, that Plaintiff did attend special education classes while in school. (R. 399). Nevertheless, Dr. Link found that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short, simple instructions; to carry out very short, simple instructions; to carry out detailed instructions; to sustain an ordinary routine without special supervision; to make simple, work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to be aware of normal hazards and take appropriate precautions; or to travel in unfamiliar places

---

that Plaintiff could *occasionally* bend and kneel, but *never* stoop, crouch, balance, and climb. (R. 382) (emphasis added).

and use public transportation. (R. 397-98). Dr. Link opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; and to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances. (R. 397-98). Based on her review of all of the evidence, Dr. Link concluded that Plaintiff could meet the basic mental demands of competitive work on a sustained basis despite her impairments. (R. 399).

### B. Procedural History

Plaintiff filed an application for DIB on July 28, 2010, in which she claimed total disability since February 28, 2006. (R. 137-40). She was last insured for the purposes of DIB on June 30, 2011. (R. 24). Plaintiff's claim was initially denied on October 27, 2010. (R. 97). Plaintiff thereafter requested a hearing, which was held on November 14, 2011, before Administrative Law Judge Karen B. Kostol ("ALJ"). (R. 44-94). Plaintiff was represented by counsel and testified at the hearing. (R. 44-81). Larry Ostrowski, Ph.D., an impartial vocational expert, also testified at the hearing. (R. 81-94).

On January 5, 2012, the ALJ issued a decision, in which she denied Plaintiff's claim for benefits. (R. 21). The ALJ's decision became the final decision of the Commissioner on July 10, 2013, when the Appeals Council denied Plaintiff's request for review. (R. 1).

On August 28, 2013, Plaintiff filed her Complaint in this Court in which she seeks judicial review of the decision of the ALJ. (ECF No. 1). These cross-motions for summary judgment then followed. (ECF Nos. 6, 9)

### III. Legal Analysis

### A. Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision.

42 U.S.C. §§ 405(g), 1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. *Id.* § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted). It consists of more than a scintilla but less than preponderance of evidence. *Id.*

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. 42 U.S.C . § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1). This may be done in two ways: (1) by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, *see Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or (2) in the

event that claimant suffers from a less severe impairment, by demonstrating that she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2009); 42 U.S.C. § 423(d)(2)(C) (providing that the "Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

### B.     The ALJ's Decision

As step one of the sequential evaluation process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date. (R. 26). At step two, the ALJ found that Plaintiff has the following severe impairments: "bilateral rotator cuff impingement syndrome, status post multiple surgeries; osteoarthritis of the right hip and sacroiliac (SI) joint;

borderline intellectual functioning (BIF); and a pain disorder." (R. 26). None of these impairments – alone or in combination – met or equaled any of the listed impairments, however. (R. 26). As a result, the ALJ went on to assess Plaintiff RFC and determined that Plaintiff could perform light work with the following non-exertional limitations:

> [S]he must be allowed to sit or stand alternatively so long as not off task more than 10% of the work day. Her job must accommodate the use of a cane for balance and/or ambulation; [she] can lift up to 3 lbs frequently and 10 lbs occasionally, can occasionally climb ladders, ropes or scaffolds, ramps or stairs, balance, stoop, crouch, kneel, and crawl. The claimant must avoid concentrated exposure to excessive wetness and humidity, vibration and must avoid all hazards (e.g. moving machinery, unprotected heights); Said individual would have limited use of the right upper extremity such that she would only be able to use the right upper extremity to assist the left upper extremity and manipulate light objects; limited to no overhead activities with either arm; capable of occasional fine manipulation; limited to simple, routine and repetitive tasks with few, if any, changes in the work setting; occasional interaction with the general public.

(R. 30).

At step four, the ALJ found that Plaintiff did not retain the RFC to return to her past relevant work. (R. 35). However, based on the VE's testimony, the ALJ found that Plaintiff could perform jobs which exist in significant numbers in the national economy: storage facility clerk (light, unskilled work); information clerk (light, unskilled work); surveillance systems monitor (sedentary, unskilled work); telephone quotation clerk (sedentary, unskilled work); and charge account clerk (sedentary, unskilled work). (R. 36). Accordingly, the ALJ held that Plaintiff was not disabled within the meaning of the Act. (R. 37).

## C.    Discussion

Plaintiff raises two related arguments in support of her motion for summary judgment. First, she contends that the ALJ violated Social Security Rulings ("SSR") 96-6p and 96-8p and 20 C.F.R. § 404.1527(f) by failing to explain why Dr. Kaplan's opinions were not fully adopted, even though the ALJ found them to be "fully consistent with the medical evidence of record" and

entitled to "great weight." Second, Plaintiff argues that the ALJ violated SSRs 96-6 and 96-8p by failing to sufficiently explain why Dr. Hughes' opinion regarding Plaintiff's inability to use her right arm was rejected. These arguments will be addressed *seriatim*.

1.    *Did the ALJ err in failing to explain why Dr. Kaplan's opinion was not fully adopted?*

An ALJ must support his RFC assessment with "'a clear and satisfactory explication of the basis on which it rests.'" *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). The ALJ's explanation for her decision "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based." *Id.* (citing *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)); *see also* SSR 96–8p, 1996 WL 374184, at *7 (July 2, 1996) (explaining that the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence"). Medical source statements, from treating and non-treating sources alike, must be considered as part of this discussion. *See id.*; SSR 96–5p, 1996 WL 374183, at *2 (July 2, 1996). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

With regard to Dr. Kaplan, the ALJ made the following statement:

> The consultative examiner, Richard S. Kaplan, M.D. opined she is not able to perform overhead activities with either arm and she is limited to lifting no more than 3 pounds frequently or 10 pounds occasionally. Dr. Kaplan further opined that she was limited to only occasional postural activities, and she should avoid working at heights or machinery. The opinion of Dr. Kaplan was fully consistent with the medical evidence and adequately considered her subjective complaints and the combined effects of her impairments. Therefore, the undersigned gave Dr. Kaplan's opinion great weight.

(R. 34) (internal citations omitted). However, as Plaintiff points out, the ALJ, despite finding Dr.

Kaplan's opinions worthy of "great weight," did not include some of the limitations found in Dr. Kaplan's statement in her RFC assessment. Specifically, Dr. Kaplan opined that Plaintiff would never be able to stoop, crouch, balance, or climb. (R. 382). Yet, in her RFC assessment, the ALJ found that Plaintiff could occasionally climb ladders, ropes, scaffolds, ramps, and stairs; balance; stoop; and crouch. (R. 30). To be sure, the ALJ was not required to adopt the opinions in Dr. Kaplan's MSS *in toto*, even if she found the MSS, on the whole, to be persuasive. Rather, she could have adopted some and rejected others, so long as she provided a sufficient explanation for her decision. *See* SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996) ("Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one.").

The ALJ, however, did not even so much as acknowledge that she was adopting portions of Dr. Kaplan's MSS, while rejecting others – let alone offer any explanation for the discrepancy between her RFC assessment and Dr. Kaplan's report, which she purportedly found to be entitled to "great weight." By failing to do so, she ran afoul of SSR 96-8p.[3] *See, e.g.*, *Lodwick v. Astrue*, No. 10–1394–SAC, 2011 WL 6253799, at *5 (D. Kan. Dec. 13, 2011) (remanding case where ALJ asserted that he gave "substantial weight" to medical source's opinions, yet, without

---

[3] It is certainly plausible, in light of the slight internal inconsistency in Dr. Kaplan's MSS, that the ALJ did not believe that there was any discrepancy to resolve between her RFC assessment and Dr. Kaplan's opinion. As previously noted, in his letter to the state agency, Dr. Kaplan remarked that Plaintiff should be limited to "occasional postural activities." (R. 380). Further along in the report, however, Dr. Kaplan clarified that although Plaintiff could occasionally perform some postural activities (bending and kneeling), she could *never* stoop, crouch, balance, or climb. (R. 382). Perhaps the ALJ believed that by limiting Plaintiff to occasional postural activities across the board, she was fully adopting Dr. Kaplan's assessment—at least the version that appears in the initial part of his MSS. Maybe the ALJ simply overlooked the subsequent portion of the form. Nevertheless, that the ALJ may have misinterpreted or misunderstood Dr. Kaplan's findings with regard to Plaintiff's postural activities does not absolve her of her error. Rather, it highlights the need for an ALJ to fully explain her findings. Otherwise, the district court is left to engage in this sort of speculation about how an ALJ arrived at her decision.

explanation, failed to include some of the limitations contained in the source's MSS in his RFC).

Although the discrepancy between the ALJ's RFC assessment and Dr. Kaplan's opinion was fairly minor, the Court cannot conclude that the ALJ's failure to resolve the discrepancy was harmless. Completely restricting Plaintiff from being able to climb probably would not have significantly diminished the number of jobs that Plaintiff could perform, and thus, would not have affected the ultimate disability determination. *See* SSR 83-14, 1983 WL 31254, at *2 (1983) (explaining that there are "[r]elatively few jobs in the national economy" that require the use of ladders or scaffolding, and therefore the degree to which a claimant can climb has little to no effect on the light, unskilled occupational base). The same cannot be said with regard to the stooping and crouching restrictions, however. As the VE testified, if Plaintiff could never stoop or crouch, she would not be able to perform the representative jobs that the VE had identified. (R. 93). Indeed, SSR 83-14 makes clear that "to perform substantially all of the exertional requirements of most sedentary and light jobs," a person would need to be able to stoop at least occasionally, though she probably would not need to be able to crouch. 1983 WL 3125, at *2. It is likely, therefore, that the VE's testimony would have differed had those additional restrictions been imposed.

Accordingly, the case must be remanded so that the ALJ may consider the specific postural limitations identified by Dr. Kaplan (i.e., no stooping, crouching, balancing, or climbing), and either include them in her RFC assessment (and in turn pose a new hypothetical question to the VE) or provide a sufficient explanation of her reasons for not adopting them.[4]

---

[4] Although Plaintiff has not raised the issue, the Court notes that the ALJ made a similar error in addressing the opinion of the state agency physician, Dr. Wyszomierski. In particular, Dr. Wyszomierski opined that Plaintiff could occasionally balance, stoop, kneel, crouch, and climb ramps and stairs but never crawl or climb ladders, ropes and scaffolds. (R. 402). The ALJ found that Dr. Wyszomierski's opinion was "fully consistent with the medical evidence of record" and entitled to "significant weight." (R. 31). She never addressed, however, why she was not adopting Wyszomierski's opinion regarding Plaintiff's inability to crawl or climb ladders, ropes, and scaffolds – limitations

Furthermore, the Court agrees with Plaintiff that the ALJ improperly failed to explain how her finding that Plaintiff required a cane to ambulate/balance was in any way consistent with her finding that Plaintiff could climb ladders, ropes, and scaffolds. Common sense tells us that a person who requires a cane to balance should probably not be permitted to engage in those activities. If, upon remand, the ALJ continues to believe that Plaintiff can climb, despite her need for a cane, she must provide a thorough explanation as to how those two things can co-exist.

2. *Did the ALJ err in failing to sufficiently explain why Dr. Hughes' opinion was "rejected"?*

It is well settled that a treating physician's opinion on issues not reserved for the commissioner must be deemed "controlling" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Fargnoli*, 247 F.3d at 42; *see* SSR 96-5p, 1996 WL 374183 (clarifying how ALJ should treat medical opinions on issues reserved for the commissioner, e.g., the ultimate finding of disability and a claimant's RFC). Consequently, "[a]n ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence," though she "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)). If the ALJ decides to reject a treating physician's opinion, or accord it less weight, she must sufficiently explain her reasons for doing so. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); SSR 96-2P, 1996 WL 374188, at *5.

In this case, the ALJ considered Dr. Hughes' opinion regarding Plaintiff's limited ability to use her upper extremities, but decided that it could not be accorded "great weight because it it

---

not contained in her RFC assessment. On remand, therefore, the ALJ must square this discrepancy, in addition to that with respect to the opinion of Dr. Kaplan.

is inconsistent with the totality of the evidence in the file." (R. 34). She further concluded that Dr. Hughes had "overestimate[d] . . . the severity of the claimant's functional restrictions. For instance, [Dr. Hughes] stated that the claimant was unable to use her right arm for work. This observation is not consistent with all of the medical and non-medical evidence in the claims folder." (R. 34). Similarly, the ALJ opined that Dr. Hughes' opinion was "without substantial support from the other evidence of record, which rendered it less persuasive." (R. 34). She also concluded that Dr. Hughes' assessment that Plaintiff retained the capacity for sedentary, one-handed left-sided touched on issues reserved for the Commissioner, and thus was not worthy of receiving significant weight.

The problem with the ALJ's treatment of Dr. Hughes' opinion is that, as Plaintiff contends, she did not actually cite to the medical evidence in the record that purportedly contradicted Dr. Hughes' point of view. The Court recognizes that ultimately it is the ALJ's duty – and hers alone – to determine a claimant's RFC and that a treating source's opinion on that issue is not entitled to "special significance." SSR 96-5p, 1996 WL 374183. Be that it is may, such an opinion must still be considered and specific reasons, amply supported by citations to the record, must be offered before deciding that the opinion is not entitled to much weight. *Id.* Baldly concluding that a source's opinion is inconsistent with or unsupported by the record is not sufficient. *See Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012) (explaining that "conclusory statements by an ALJ to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion"). On remand, the ALJ must adhere to these requirements and, in re-assessing the weight to be given to Dr. Hughes' opinion, specifically cite to medical evidence in the record

that contradicts or weakens Dr. Hughes' findings as to Plaintiff's inability to use her right arm for work.

**IV.**  **Conclusion**

Under the Social Security regulations, a federal district court, upon review of a decision of the Commissioner which denied benefits, has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of an objective review of all of the evidence in the record, the Court finds that the ALJ failed to support her decision with substantial evidence and that the decision must be remanded to the ALJ for further consideration consistent with this Opinion. The Commissioner's decision in the present case may, however, ultimately be correct and nothing hereinabove stated should be taken to suggest that the Court has concluded otherwise.

For these reasons, Plaintiff's motion for summary judgment will be **GRANTED** insofar as it requests a remand for further consideration in accordance with sentence four of 42 U.S.C. § 405(g); Defendant's motion for summary judgment will be **DENIED**; and the decision of the ALJ will be **VACATED** and **REMANDED** for further consideration consistent with this Opinion. An appropriate order follows.

McVerry, J.

PAMELA M. CASSIDY,　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　v.　　　　　　　　　　)　　2:13-1203
　　　　　　　　　　　　　　　　　　)
CAROLYN W. COLVIN,　　　　　　　　)
ACTING COMMISSIONER OF　　　　　　)
SOCIAL SECURITY,　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)
　　　　　　　　　　　　　　　　　　)

## ORDER

**AND NOW**, this 16th day of May, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that:

1.　　Defendant's Motion for Summary Judgment is **DENIED**.

2.　　Plaintiff's Motion for Summary Judgment is **GRANTED** insofar as it requests remand to the Commissioner for further proceedings consistent with the foregoing Memorandum Opinion pursuant to the fourth sentence of 42 U.S.C. § 405(g); and **DENIED** insofar as it requests that benefits be awarded.

3.　　The Clerk will docket this case closed.

　　　　　　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　s/ Terrence F. McVerry
　　　　　　　　　　　　　　　　United States District Judge

cc:　　George E. Clark
　　　　Email: gclark@resultmatters.com

　　　　Christy Wiegand
　　　　Email: christy.wiegand@usdoj.gov